**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                          :

TREVOR BAUER,                    :    No. 1:22-cv-1822-PAC-OTW

              Plaintiff,    :

                       :    ECF Case

           -against-      :

                       :

CHRIS BAUD, and G/O MEDIA, INC.,  :

           Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'</u>
## <u>MOTION TO DISMISS THE COMPLAINT</u>

Lynn B. Oberlander
Joseph Slaughter
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019
Tel: (212) 223-0200
Fax: (212) 223-1942
oberlanderl@ballardspahr.com
slaughterj@ballardspahr.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ............................................................................................................... 1

RELEVANT FACTUAL BACKGROUND ......................................................................... 3

A.     THE PARTIES ...................................................................................................... 3

        1.     Trevor Bauer ............................................................................................ 3

        2.     G/O Media, Inc. and Chris Baud ............................................................ 5

B.     L.H.'S ALLEGATIONS AGAINST PLAINTIFF ................................................ 5

        1.     Plaintiff Allegedly Sexually Assaults L.H. ............................................. 5

        2.     L.H.'s Injuries ......................................................................................... 7

        3.     Initial Reporting on Plaintiff's Alleged Sexual Assault ......................... 7

C.     THE *DEADSPIN* ARTICLE ................................................................................. 9

D.     SUBSEQUENT EVENTS ................................................................................... 10

E.     THE COMPLAINT ............................................................................................ 11

ARGUMENT ..................................................................................................................... 12

I.     PLAINTIFF HAS FAILED TO STATE A CLAIM FOR DEFAMATION ..................... 12

        A.     Legal Standard ...................................................................................... 12

        B.     The Challenged Statements are Substantially True ............................... 13

                1.     The Responsibility Statement Is Substantially True ................. 14

                2.     The Skull Fracture and CT Scan Statements are Substantially True ........................................................................................... 15

                3.     The Skull Fracture Statement Is Rhetorical Hyperbole and Therefore Non-Actionable ....................................................... 17

        C.     The Skull Fracture and CT Scan Statements Do Not Cause Any Appreciable Additional Harm to Plaintiff ............................................ 18

        D.     The Allegedly Defamatory Statements Are Absolutely Privileged Under New York Law ......................................................................... 19

E.      Plaintiff Has Failed to Adequately Allege Actual Malice ....................................21

F.      Plaintiff Has Failed to Adequately Allege Damages .............................................24

CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Aboutaam v. Dow Jones & Co.*,
   No. 156399/2017, 2019 N.Y. Misc. LEXIS 1287 (Sup. Ct. N.Y. Cnty. Mar.
   22, 2019) ..............................................................................................................................17

*Adelson v. Harris*,
   973 F. Supp. 2d 467 (S.D.N.Y. 2013) ...........................................................................4, 13, 22

*Adelson v. Harris*,
   876 F.3d 413 (2d Cir. 2017) .........................................................................................4, 20

*Albert v. Loksen*,
   239 F.3d 256 (2d Cir. 2001) ..............................................................................................24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...........................................................................................................12

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ......................................................................................................12, 13

*Boyd v. Nationwide Mut. Ins.*,
   208 F.3d 406 (2d Cir. 2000) ..............................................................................................24

*Celle v. Filipino Reporter Enters.*,
   209 F.3d 163 (2d Cir. 2000) ..........................................................................................18, 23

*Cholowsky v. Civiletti*,
   69 A.D.3d 110 (2d Dep't 2009) .........................................................................................20

*Church of Scientology Int'l v. Behar*,
   238 F.3d 168 (2d Cir. 2001) ..........................................................................................18, 21

*Coleman v. Grand*,
   523 F. Supp. 3d 244 (E.D.N.Y. 2021) ...............................................................................21

*Cusimano v. United Health Servs. Hosps.*,
   91 A.D.3d 1149 (3d Dep't 2012) .......................................................................................16

*Davis v. Boeheim*,
   24 N.Y.3d 262 (2014) ........................................................................................................18

*Dillon v. City of N.Y.*,
   261 A.D.2d 34 (1st Dep't 1999) ........................................................................................24

*Egiazaryan v. Zalmayev*,
    880 F. Supp. 2d 494 (S.D.N.Y. 2012) ................................................................18

*Finkel v. Dauber*,
    29 Misc. 3d 325 (Sup. Ct. Nassau Cnty. 2010) ................................................17

*Flamm v. Am. Ass'n of Univ. Women*,
    201 F.3d 144 (2d Cir. 2000) ......................................................................17, 18

*Fleischer v. NYP Holdings*,
    104 A.D.3d 536 (1st Dep't 2013) ......................................................................14

*Friedman v. Bloomberg L.P.*,
    884 F.3d 83 (2d Cir. 2017) ........................................................................19, 20

*Ganske v. Mensch*,
    480 F. Supp. 3d 542 (S.D.N.Y. 2020) ..............................................................18

*Garber v. Legg Mason, Inc.*,
    347 F. App'x 665 (2d Cir. 2009) .........................................................................4

*Gertz v. Robert Welch*,
    418 U.S. 323 (1974) ....................................................................................23, 24

*Gross v. N.Y. Times Co.*,
    82 N.Y.2d 146 (1993) ........................................................................................17

*Halebian v. Berv*,
    644 F.3d 122 (2d Cir. 2011) ................................................................................4

*Herbert v. Lando*,
    781 F.2d 298 (2d Cir. 1986) ..............................................................................18

*Hicks v. City of N.Y.*,
    232 F. Supp. 3d 480 (S.D.N.Y. 2017) ..............................................................16

*Ingber v. Lagarenne*,
    299 A.D.2d 608 (3d Dep't 2002) ......................................................................14

*Jankovic v. Int'l Crisis Grp.*,
    822 F.3d 576 (D.C. Cir. 2016) ..........................................................................23

*Kinsey v. N.Y. Times Co.*,
    991 F.3d 171 (2d Cir. 2021) ..............................................................................19

*Kipper v. NYP Holdings*,
    12 N.Y.3d 348 (2009) ........................................................................................23

*Konikoff v. Prudential Ins. Co. of Am.*,
   No. 94 Civ. 6863 (MBM) (MHD), 1999 U.S. Dist. LEXIS 13501 (S.D.N.Y.
   Aug. 31, 1999) ...................................................................................................22

*Kraus v. Brandstetter*,
   167 A.D.2d 445 (2d Dep't 1990) ......................................................................14

*Lafaro v. NYC Cardiothoracic Grp.*,
   570 F.3d 471 (2d Cir. 2009).............................................................................12

*Liberman v. Gelstein*,
   80 N.Y.2d 429 (1992) ................................................................................24, 25

*Lindell v. Man Media Inc.*,
   No. 1:21-cv-667-PAC, 2021 U.S. Dist. LEXIS 237022 (S.D.N.Y. Dec. 10,
   2021) ..........................................................................................................13, 19

*Masson v. New Yorker, Magazine, Inc.*,
   501 U.S. 496 (1991) ..........................................................................................13

*McDougal v. Fox News Network*,
   489 F. Supp. 3d 174 (S.D.N.Y. 2020)...............................................................17

*Medcalf v. Walsh*,
   938 F. Supp. 2d 478 (S.D.N.Y. 2013)...............................................................25

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ..........................................................................................21

*Nguyen v. FXCM Inc.*,
   364 F. Supp. 3d 227 (S.D.N.Y. 2019)...............................................................4

*Oakley v. Dolan*,
   No. 17-cv-6903 (RN), 2020 U.S. Dist. LEXIS 28267 (S.D.N.Y. Feb. 19,
   2020) ..................................................................................................................24

*Palin v. N.Y. Times Co.*,
   940 F.3d 804 (2d Cir. 2019)..............................................................................21

*Phila. Newspapers v. Hepps*,
   475 U.S. 767 (1986) ..........................................................................................13

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) ..........................................................................................21

*Steinhilber v. Alphonse*,
   68 N.Y.2d 283 (1986) ........................................................................................17

*Suozzi v. Parente*,
   202 A.D.2d 94 (1st Dep't 1994) ...........................................................................23

*Tannerite Sports v. NBC Universal News Grp.*,
   864 F.3d 236 (2d Cir. 2017)................................................................13, 14, 16

*Test Masters Educ. Servs. v. NYP Holdings*,
   603 F. Supp. 2d 584 (S.D.N.Y. 2009)................................................................20

*Time, Inc. v. Pape*,
   401 U.S. 279 (1971) ...........................................................................................23

*Walker v. City of N.Y.*,
   No. 12 Civ. 5902 (PAC), 2014 U.S. Dist. LEXIS 42272 (S.D.N.Y. Mar. 18, 2014) ....................................................................................................................4

*Wright v. Dennis*,
   No. 604318/2006, 2008 WL 475914 (N.Y. Sup. Ct. Feb. 11, 2008) ...................14

**Statutes**

N.Y. Civ. Rights Law § 70-a ...................................................................................13

N.Y. Civ. Rights Law § 74 .................................................................................19, 20

N.Y. Civ. Rights Law § 76-a ..............................................................................13, 21

**Other Authorities**

Fed. R. Civ. P. 12(b)(6).......................................................................................12, 13

N.Y. CPLR 3211(g) ..................................................................................................13

U.S. Const. amend. I ...................................................................................13, 17, 21, 23

## INTRODUCTION

Plaintiff Trevor Bauer has brought this meritless defamation lawsuit to punish truthful commentary on an issue of significant public concern – widely-reported accusations that the star Los Angeles Dodgers pitcher committed a brutal and violent sexual assault against a young woman in May of 2021. Plaintiff does not deny the substance of the editorial in question – that he had sex with the woman, that it was violent, and that she went to the hospital with serious injuries as a result.  Rather, he claims he was defamed by minor alleged inaccuracies in how the piece described her injuries, and in how it characterized his justification for his actions. But none of the statements he identifies are actionable as defamation – in part because the elements he does not challenge are as disturbing as the allegedly false statements – and the Complaint should therefore be dismissed in its entirety, with prejudice.

The instant action arises from a July 6, 2021 editorial article entitled "Trevor Bauer Should Never Pitch Again" (the "Article"), written by Defendant Chris Baud and published by Defendant G/O Media, Inc. (together, "Defendants") on the well-known sports news website *Deadspin*. The Article was published days after a young woman, L.H., filed a petition for a temporary restraining order against Plaintiff, alleging in court filings that he had punched, scratched, strangled, sodomized, and otherwise assaulted her during a pair of sexual encounters in April and May of 2021.  As is evident from its headline, the Article is primarily an opinion piece that describes some of the graphic allegations in L.H.'s petition, prior news reporting on the underlying legal proceedings, and the author's view of the repercussions Plaintiff should face for his conduct.

The Complaint does not challenge the accuracy of the vast majority of the Article, including statements that L.H. had her "face beaten," suffered "a swollen jaw, bloodied lip, and scratches to the side of her face," was "visibly bruised" on her face, and was "anally penetrated

without consent" during her encounters with Plaintiff.  Nor does Plaintiff take issue with the

Article's description of him as a "misogynist," "cretin," and "assaulter."  Instead, the Complaint

asserts a single claim for defamation *per se* based on three minor allegedly false details that were

updated within days: (1) that L.H. "did not consent to have her face beaten and her skull

fractured" by Plaintiff, Compl. ¶ 91 (the "Skull Fracture Statement"), (2) that "Mr. Bauer's

'defense' was that '[i]t was only the initial CT scan that showed a fracture,'" *id.* ¶ 92 (the "CT

Scan Statement"), and (3) that "Mr. Bauer did not 'attempt to deny that he was responsible'" for

L.H.'s injuries, *id.* ¶ 93 (the "Responsibility Statement").  For multiple reasons, none of these

statements are actionable as defamation.

<u>First</u>, Plaintiff cannot establish that the challenged statements are materially false, a basic

element of his defamation claim. Rather, the Skull Fracture and CT Scan Statements are

substantially true, as there is little or no difference to the reader between what Plaintiff alleges is

false in the Article – the statement that L.H. had her "skull fractured" – and what he

acknowledges is true – that following a sexual encounter with Plaintiff, L.H. went to the hospital

with  "signs of a basilar skull fracture" Compl. (ECF 3) ¶ 102, and was ultimately diagnosed

with an "acute head injury" even though a CT scan revealed no "acute fracture[.]"  Similarly, the

Responsibility Statement is not false, because Plaintiff never denied he was responsible for

L.H.'s injuries – he argued only that their sex was consensual.  Additionally, the challenged

statements are mere rhetorical hyperbole, expressed in the opinionated, irreverent voice of

*Deadspin*, and are therefore not actionable.

<u>Second</u>, for much the same reasons, the challenged statements are also non-actionable

under New York's "incremental harm" doctrine.  Plaintiff does not challenge the vast majority of

the statements in the Article describing the allegations in L.H.'s petition about his behavior or

the severe injuries L.H. suffered as a result. The allegedly false statements could not plausibly cause Plaintiff any incremental harm separate from that caused by the unchallenged facts recited in the editorial.

Third, the statements are absolutely privileged under New York law as fair and accurate reports of a judicial proceeding – that is, L.H.'s petition for a TRO against Plaintiff.

Fourth, Plaintiff, who is indisputably a public figure, has not and cannot adequately allege that the challenged statements were published with actual malice, including because the Article itself provides hyperlinks to the underlying sources on which it bases its conclusions.

Finally, Plaintiff seeks to skirt the requirement that he plead "special damages" by claiming that the challenged statements are defamatory *per se*.  But Plaintiff has not asserted that the allegedly false statements implicate his ability to perform his trade as a baseball player nor accuse him of a serious crime (beyond any crime alleged in the accurate descriptions of L.H.'s petition) and thus the statements are not defamatory *per se*.

## RELEVANT FACTUAL BACKGROUND

### A.  THE PARTIES

#### 1.  Trevor Bauer

Plaintiff Trevor Bauer is a famous professional baseball pitcher.  Until recently, Plaintiff's professional career had been a marked success – drafted third overall in the 2011 MLB amateur draft, he had gone on to become an all-star, a Cy Young Award winner, and the recipient of a three-year, $102-million contract with the Los Angeles Dodgers that made him, at the time, the highest paid player in the history of baseball.  However, following L.H.'s allegations, he was placed on administrative leave by the league for nearly a year, and, after its own investigation, MLB recently imposed a further (and record-setting) two-*year* suspension.

Even prior to L.H.'s public allegations, Plaintiff had been involved in more than his share of controversy.  As reporting referenced in his own Complaint describes, Plaintiff has long cultivated a reputation as an internet provocateur with a penchant for vicious and vitriolic confrontations on social media with fans and media members alike. *See* Compl. ¶¶ 17-27.[1]  As Plaintiff told a former teammate, he is "good at two things in this world: throwing baseballs, and pissing people off."[2]

Many of those controversies have centered around Plaintiff's attitude toward and treatment of women. As particularly germane to this action, Plaintiff has a widely reported penchant for violent sex – as of this writing, at least three women have alleged that he punched, choked, and otherwise violently assaulted them during sex without their consent, and at least two of them have sought court orders of protection against him.[3]

---

[1] The Complaint refers to and/or quotes from multiple news reports, including the Article itself, as well as numerous other *Deadspin* articles about Plaintiff. The Complaint also refers to and relies on papers filed by L.H. in the underlying legal proceedings.  All of these materials are properly before the Court, as it is well-established that the full text of documents expressly referenced and relied upon in a complaint may be considered on a motion to dismiss.  *See, e.g.*, *Halebian v. Berv*, 644 F.3d 122, 130 n.7 (2d Cir. 2011).  Moreover, to the extent the referenced articles incorporate hyperlinks to other publications, those hyperlinked materials too are properly before the Court because they comprise the necessary context to evaluate the allegedly defamatory statements.  *See, e.g.*, *Adelson v. Harris*, 973 F. Supp. 2d 467, 484 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017).  Finally, the Court may also take judicial notice of all of these materials, particularly because this is a defamation case where the broader context in which a given statement was disseminated is an important element of the legal analysis.  *See, e.g.*, *Walker v. City of N.Y.*, No. 12 Civ. 5902 (PAC), 2014 U.S. Dist. LEXIS 42272, at *4 (S.D.N.Y. Mar. 18, 2014) (Crotty, J.) (judicial notice "may encompass the status of other lawsuits in other courts and the substance of papers filed in those actions"); *Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 233 n.4 (S.D.N.Y. 2019) (Crotty J.) (taking judicial notice of party's website); *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (taking judicial notice of press articles "to show that information [at issue] was publicly available").

[2] Ben Reiter, *Trevor Bauer Is More Concerned With Being Right Than Being Liked*, SPORTS ILLUSTRATED (Feb. 19, 2019), https://bit.ly/3tnjNy6.

[3] *See, e.g.*, Brittany Ghiroli & Katie Strang, *Graphic details, photos emerge in restraining order filed against Dodgers pitcher Trevor Bauer*, THE ATHLETIC (June 30, 2021),

## 2.  G/O Media, Inc. and Chris Baud

Defendant G/O Media, Inc. is a New York-based media company that owns and operates several popular news and culture websites.  Among them is *Deadspin*, a well-known sports publication that, in its masthead, characterizes itself as providing "Sports News Without Fear, Favor or Compromise."[4]  Its editorial mission is "independent-minded and questioning; irreverent when warranted, sometimes scathing, always pithy, smart and incisive[,]" and its articles are "written in a conversational style, employ a range of rhetorical devices, and use the vernacular of their audiences."[5]

Defendant Chris Baud, who authored the Article, is the managing editor of *Deadspin*, and a former editor of the *New York Daily News*.

## B.  L.H.'S ALLEGATIONS AGAINST PLAINTIFF

The Article was published in the wake of, and directly addresses, L.H.'s sexual assault allegations against Plaintiff.  Defendants therefore provide a fuller account of those allegations here.

## 1.  Plaintiff Allegedly Sexually Assaults L.H.

On June 29, 2021, L.H., a twenty-seven-year-old resident of San Diego, California, filed a petition for a domestic violence restraining order against Plaintiff in the Superior Court of Los Angeles County (the "Petition").  According to her declaration attached to the Petition, L.H. and

---

https://bit.ly/3xjHDeW (Declaration of Lynn B. Oberlander ("Oberlander Decl."), Ex. C (the "Athletic Article"); Gus Garcia-Roberts & Molly Hensley-Clancy, *Dodgers star Trevor Bauer, on leave amid assault probe, was subject of previous protection order*, WASH. POST (Aug. 14, 2021), https://wapo.st/3xiDg3U; Gus Garcia-Roberts, *As MLB suspends Trevor Bauer, a new accuser speaks out*, WASH. POST (Apr. 30, 2022), https://wapo.st/3zGQkTN.

[4] *Home Page*, DEADSPIN, https://deadspin.com/.

[5] *Editorial Policy*, G/O MEDIA, https://g-omedia.com/editorial-policy/.

Plaintiff first met through Instagram messages on April 18, 2021, and subsequently met in person after Plaintiff invited her to his house on April 21, 2021.[6]  Oberlander Decl., Ex. A, ¶¶ 3, 5.  In the early hours of April 22, 2021, L.H. and Plaintiff engaged in "consensual sex."  *Id*. ¶ 6.  During this encounter, Plaintiff asked L.H. if she "had ever been choked during sex."  *Id*. ¶ 8.  L.H. answered affirmatively and, afterward, Plaintiff began to "put[] his fingers down [L.H.'s] throat in an aggressive manner."  *Id*.  He then proceeded to "wrap[] [L.H.'s] hair around [her] neck and choke[] [her]" until she lost consciousness.  *Id*.  Sometime later, L.H. "woke up face down on the bed, disoriented," and realized that Plaintiff was "having sex with [her] in [her] anus," an act to which she had never given her consent.  *Id*. ¶ 9.  That night, L.H. "noticed [she was] bleeding from [her] anus" and was "barely able to walk." *Id*. ¶ 10.

Nonetheless, over the next three weeks, L.H. and Plaintiff continued to communicate.  On the night of May 15, 2021, L.H. accepted another invitation to stay at Plaintiff's house in Pasadena.  *Id*. ¶ 13.  Around 2:00 A.M., they began to have consensual sex.  *Id*. Approximately "five minutes" into the encounter, Plaintiff "again wrapped [L.H.'s] hair around [her] neck and choked [her]."  *Id*. ¶ 14.  L.H. lost consciousness and again woke up disoriented.  *Id*.  Shortly thereafter, Plaintiff began "punching [L.H.'s] face," including "with a closed fist to the left side of [her] jaw, the left side of [her] head, and both cheekbones."  *Id*. ¶¶ 14, 15.  He proceeded to choke L.H. with her own hair, and, for a third time in two sexual encounters, L.H. lost consciousness.  *Id*. ¶ 15.  She awoke to the taste of blood in her mouth and "felt that [her] lip was split open."  *Id*.  At this point, Plaintiff "opened [L.H.'s] legs to expose [her] vagina and began punching [her] repeatedly" there, until L.H. began to cry.  *Id*. ¶ 16.

---

[6] A true and correct copy of the Declaration of L.H. submitted with her Petition ("L.H. Decl.") is attached as Exhibit A to the Oberlander Declaration.

### 2.  L.H.'s Injuries

After the alleged assault, L.H. claims she was "nauseous and dizzy." *Id*. ¶ 17.  The next morning, she had "two dark black eyes," "a completely swollen jaw and cheekbones," ten "dark red and scabbed scratches from fingernails on the right side of [her] face," black bruises on her gums, a "large bump on the top left side of [her] head," "severe black bruising over the top of [her] vagina," and "multiple bruises all over the right cheek on [her] butt." *Id*. ¶ 19.

L.H. subsequently went to the emergency room at Alvarado Hospital Medical Center to seek care. *Id*. at ¶ 20.  According to L.H.'s declaration, she was diagnosed with "an acute head injury and assault by manual strangulation," and her "medical exam recognized ecchymoses [bruising] on [her] cheek and orbital bone, as well as above [her] vagina, on [her] labia, and buttocks." *Id*. ¶ 22.  The declaration also states that L.H. "sustained significant head and facial trauma" and exhibited "signs of a basilar skull fracture." *Id*.  L.H. attached copies of her medical records confirming these diagnoses to her declaration. *Id*., Ex. 6.

### 3.  Initial Reporting on Plaintiff's Alleged Sexual Assault

After L.H. publicly filed her TRO request against Plaintiff on June 29, 2021, the alleged assault instantly became a national news story.  Reporting in major publications noted that the allegations were "sickening,"[7] that Plaintiff was known to have a "penchant for cyberbullying paired with a side of misogyny,"[8] and that Plaintiff didn't "belong in the privileged space of a

---

[7] Stephanie Apstein, *Trevor Bauer Must Not Start Sunday*, SPORTS ILLUSTRATED (July 1, 2021), https://bit.ly/3O1iZqj.

[8] Gabe Lacques, *Trevor Bauer must sit until MLB, Dodgers can find 'right result'*, USA TODAY (July 3, 2021), https://bit.ly/3mqTl2H.

Major League Baseball dugout" but rather "belong[ed] in a psychological evaluation."[9] As the Complaint notes, multiple media outlets reported that Plaintiff had fractured L.H.'s skull. Compl. ¶ 3.

Two additional articles are of particular relevance to this case.  The first was published on June 29, 2021 – the day L.H. filed her TRO petition – on the celebrity gossip website *tmz.com*. *See* Oberlander Decl., Ex. B ("TMZ Article").  The article, entitled "TREVOR BAUER: WOMAN ACCUSES MLB STAR OF ASSAULT . . . Bauer Denies Allegation," included a lengthy quote from Jon Fetterolf, identified in the article as Plaintiff's agent, who stated that L.H.'s "basis for filing a protection order is nonexistent, fraudulent, and deliberately omits key facts, information, and her own relevant communications" and that "[a]ny allegations that the pair's encounters were not 100% consensual are baseless [and] defamatory."  Fetterolf further claimed that Plaintiff "had a brief and wholly consensual sexual relationship initiated by" L.H. and that L.H. had "repeatedly ask[ed] for 'rough' sexual encounters involving requests to be 'choked out' and slapped in the face."  L.H. dictated "what she wanted from [Bauer] sexually," Fetterolf said, and he "did what was asked." TMZ Article at 1.

Second, on June 30, 2021, *The Athletic*, a popular sports news publication, ran a story entitled "*Graphic details, photos emerge in restraining order filed against Dodgers pitcher Trevor Bauer.*"  *See* Oberlander Decl., Ex. C.  The Athletic Article reported on the substance of L.H.'s Petition, including the photographs L.H. submitted to the court, which (according to the Athletic Article) showed her face to be "visibly bruised and swollen, including under both of her eyes.  She also has a swollen jaw, bloodied lips and scratches to the side of her face."  The

---

[9] Sally Jenkins, *Major League Baseball's Trevor Bauer problem has an obvious solution*, WASH. POST (Aug. 19, 2021), https://wapo.st/3xyq4JM.

Athletic Article also noted that L.H.'s declaration stated that she "had 'significant head and facial trauma' and that there were signs of a basilar skull fracture[,]" as well as reporting that "Trevor Bauer's representatives emphasized that medical records showed that while the woman was initially diagnosed with signs of a basilar skull fracture, a subsequent CT scan found no acute fracture."  Athletic Article at 1.[10]

### C.  THE *DEADSPIN* ARTICLE

On July 6, 2021, following the holiday weekend, Defendants first published the Article on *Deadspin*.  *See* Compl. Ex. A, ECF No. 3-1.  The Article begins by noting that Plaintiff had a scheduled pitching appearance cancelled after he was "accused of sexual assault and battery," and provides a hyperlink to the Athletic Article, along with an excerpt from the Athletic Article reciting the injuries described in L.H.'s declaration.  The Article then declares, in *Deadspin's* typically irreverent style, that "you totally don't have to give Trevor Bauer the benefit of the doubt," and continues:

> There is nothing in Bauer's reported actions or his lawyer John Fetterolf's statement that indicate an attempt to deny that he was responsible, only that her request for a temporary restraining order was "fraudulent" based on the omission of key details, and that what happened was consensual.  Bauer's lawyer also claims to "have messages that show [the accuser] repeatedly asking for 'rough' sexual encounters."

*Id*. at 3.  The full Fetterolf statement in the TMZ Article is hyperlinked from the words "John Fetterolf." In rebuttal to Fetterolf's statement, and in reference to the ongoing legal proceedings, the Article then opines that "[w]e don't need an investigation and trial to conclude that [L.H.]

---

[10] Notably, Plaintiff has also sued *The Athletic* for defamation based on the Athletic Article.  *See Bauer v. The Athletic Media Co. et al.*, No. 2:22-cv-02062-MWF-AGR (C.D. Cal.).  He has also sued L.H. and her counsel for defamation based on the content of her Petition. *See Bauer v. Hill et al.*, No. 8:22-cv-0868-CJC-ADS (C.D. Cal.).

didn't consent to having her face beaten and her skull fractured."  This paragraph of the Article concludes by referencing Plaintiff's statement (included in the Athletic Article) that a "subsequent CT scan found no acute fracture," noting: "His legal team's defense? It was only the initial CT scan that showed a skull fracture," and once again linking to the Athletic Article.  *Id.*

The Article then reviews some of the prior controversies involving Plaintiff and offers more general opinions and observations on the social, cultural, and legal dynamics in play when famous athletes are accused of sexual assault.  It concludes by opining that, regardless of the legal proceedings, Major League Baseball should punish Plaintiff, and that any other result would be "a slap in the face of [sexual assault] victims who are baseball fans." *Id*. at 5.

#### D.  SUBSEQUENT EVENTS

The Complaint alleges that, on the day the Article was published, Plaintiff's representatives sent several emails to Mr. Baud requesting corrections to the Article, followed by a demand letter two days later.  Compl. ¶¶ 58-60.  After some back-and-forth between Plaintiffs' counsel and Defendants' in-house counsel, on July 9, Defendants modified two of the challenged statements – changing the Skull Fracture Statement from "she didn't consent to have her face beaten and her skull fractured" to "she didn't consent to have her face beaten and sustain head trauma;" and changing the CT Scan Statement from "[i]t was only the initial CT scan that showed a fracture" to "[w]hile she was initially diagnosed with signs of a basilar skull fracture, a CT scan found no acute fracture." *Id*. ¶ 64.  Deadspin also included an update to the Article:

> ***Update:*** After publication, Trevor Bauer's representatives emphasized that medical records showed that while the woman was initially diagnosed with signs of a basilar skull fracture, a CT scan found no acute fracture.  It was unclear from previous reports what the basis was for the initial indication of a fracture.

Compl. Ex. B at 4.

Following L.H.'s Petition, Plaintiff was placed on administrative leave by Major League Baseball while it conducted an investigation of his behavior.  On April 29, 2022, MLB announced a two-year, unpaid suspension of Plaintiff – the longest such suspension ever imposed under the league's domestic violence policy.

### E.  THE COMPLAINT

Plaintiff filed the instant Complaint on March 3, 2022.  The Complaint acknowledges, but does not challenge, *Deadspin*'s prior and subsequent reporting on Plaintiff.  Nor does it take issue with the general gist of the Article, or assert there is anything defamatory about the statements therein that, among other things, Plaintiff "sexually assaulted" L.H., gave her a "swollen jaw, bloodied lip and scratches to the side of her face" and "anally penetrated [her] without consent," and that she "didn't consent to have her face beaten."  Rather, it asserts that three minor details of the Article are false and defamatory: first, the statement that L.H. "didn't consent . . . to have her skull fractured" (the "Skull Fracture Statement"); second, the characterization of Plaintiff's defense against L.H. as "[i]t was only the initial CT scan that showed a fracture" (the "CT Scan Statement); and third, that there is "nothing in Mr. Bauer's reported actions or his lawyer John [sic] Fetterolf's statement that indicate an attempt to deny that he was responsible" (the "Responsibility Statement").  Compl. ¶¶ 50-56, 91-93.  The Complaint, in other words, does not dispute that Plaintiff's encounters with L.H. happened, that they were violent, that she sustained serious injuries as a result (including "signs of a basilar skull fracture," Compl. ¶ 102), or that Plaintiff was the cause of those injuries.  Rather, Plaintiff complains only that he was defamed because the Article did not adequately explain the nuances of L.H.'s various diagnoses of head trauma and did not accept his excuse that he should be absolved of responsibility for her injuries because the sexual encounter was consensual.

11

The Complaint also acknowledges that Plaintiff, as a public figure, must plead and prove actual malice in order to recover on a defamation claim.  Compl. ¶¶ 53-72.  It articulates three theories of actual malice.  First, Plaintiff claims that Defendants knew that L.H. did not suffer a skull fracture because the Athletic Article, upon which the Article relied, acknowledged that "Trevor Bauer's representatives" had argued that "while the woman was initially diagnosed with signs of a basilar skull fracture, a subsequent CT scan found no acute fracture."  *Id.* ¶ 55.  Second, Plaintiff asserts that Defendants' supposed failure to adequately correct the Article after publication is evidence of actual malice.  *Id.* ¶¶ 57-64.  Third, the Complaint alleges that Defendants' alleged failure to follow their own editorial policies is evidence of actual malice.  *Id.* ¶¶ 66-71.

Although the Complaint begins and ends with a lengthy airing of grievances regarding *Deadspin*'s prior and subsequent reporting on Plaintiff, Compl. ¶¶ 16-38, 73-87, he does not assert any substantive claims based on those stories.  Rather, Plaintiff asserts only a single claim for "defamation *per se*," based only on the Skull Fracture Statement, the CT Scan Statement, and the Responsibility Statement.  Compl. ¶¶ 88-112.

## ARGUMENT

### I.   PLAINTIFF HAS FAILED TO STATE A CLAIM FOR DEFAMATION

#### A.  Legal Standard

Under Rule 12(b)(6), a plaintiff must set forth "a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although a court must take "well-pleaded factual allegations" as true for purposes of a Rule 12(b)(6) motion, mere legal conclusions "are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see also Lafaro v. NYC Cardiothoracic Grp.*, 570 F.3d 471, 475-76 (2d Cir. 2009) (same). Where, as here, a plaintiff has "not nudged [his] claims across the line from conceivable

to plausible," the complaint "must be dismissed." *Twombly*, 550 U.S. at 570.  "Because a defamation suit may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, courts should, where possible, resolve defamation actions at the pleading stage."  *Adelson*, 973 F. Supp. 2d at 481 (internal marks omitted).[11] As Plaintiff's defamation claim does not satisfy the Rule 12(b)(6) plausibility standard, nor can its defects be remedied, his Complaint should be dismissed in its entirety, with prejudice.

### B.  The Challenged Statements are Substantially True

Both the First Amendment and New York law require a defamation plaintiff to plead and prove that the challenged statements were substantially false. *See Phila. Newspapers v. Hepps*, 475 U.S. 767, 776 (1986); *see also, e.g.*, *Lindell v. Man Media Inc.*, No. 1:21-cv-667-PAC, 2021 U.S. Dist. LEXIS 237022, at *8 (S.D.N.Y. Dec. 10, 2021) ("Under New York law a defamation plaintiff must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) *falsity of the defamatory statement*, and (5) special damages or per se actionability." (emphasis added)) (Crotty, J.).  "Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Masson v. New Yorker, Magazine, Inc.*, 501 U.S. 496, 517 (1991) (citation omitted); *see also Tannerite Sports v. NBC Universal News Grp.*, 864 F.3d 236, 242 (2d Cir. 2017) ("'Substantial truth' is the standard by which New York law . . . determines an allegedly

---

[11] New York State recently reaffirmed its commitment to the expeditious adjudication of meritless defamation suits by amending and expanding its "Anti-SLAPP" law in November of 2020.  That law provides additional protections in cases – such as this one – that threaten to stifle speech on matters of public concern.  Those protections include, among other things, that plaintiffs must meet a heightened "substantial basis" pleading standard, *see* N.Y. CPLR 3211(g); that plaintiffs must demonstrate actual malice in *all* cases involving speech on matters of public concern, *see* N.Y. Civ. Rights Law § 76-a; and that courts *must* award attorney's fees to defendants who prevail in SLAPP suits, *See* N.Y. Civ. Rights Law § 70-a.  Should they prevail in this motion, Defendants reserve the right to seek attorneys' fees under Section 70-a.

defamatory statement to be true or false.").  A statement is substantially true if it "would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id*.  Moreover, substantial truth "need not be established to an extreme literal degree" and "minor inaccuracies are acceptable." *Ingber v. Lagarenne*, 299 A.D.2d 608, 609 (3d Dep't 2002).  In conducting this analysis, "[t]he entire publication, as well as the circumstances of its issuance, must be considered in terms of its effect upon the ordinary reader." *Tannerite Sports*, 864 F.3d at 243.  Courts in this district and in New York State regularly dismiss defamation complaints at the pleading stage where they can readily determine that the allegedly defamatory statements are in fact substantially true.  *See, e.g.*, *id*. at 243-47 (confirming that substantial truth can be adjudicated on a motion to dismiss and collecting cases); *Fleischer v. NYP Holdings*, 104 A.D.3d 536, 537 (1st Dep't 2013) (affirming dismissal of complaint for failure to adequately identify false factual statements); *Kraus v. Brandstetter*, 167 A.D.2d 445, 447 (2d Dep't 1990) (affirming dismissal of defamation claim based on statement that was "substantially true"); *Wright v. Dennis*, No. 0604318/2006, 2008 WL 475914, at *2 (N.Y. Sup. Ct. Feb. 11, 2008) (dismissing defamation claim because plaintiff "fail[ed] to plead, and would be unable to prove, the falsity of the defamatory statement – an essential element of a defamation claim").  As the Article and the challenged Statements are substantially true, the Complaint should be dismissed.

### 1.  The Responsibility Statement Is Substantially True

The Complaint alleges that Plaintiff was defamed by the statement that there was "nothing in Mr. Bauer's reported actions or his lawyer John [sic] Fetterolf's statement that indicate an attempt to deny that he was responsible" for L.H.'s injuries.  Compl. ¶¶ 50, 93.  Plaintiff claims the Responsibility Statement was false because Mr. Fetterolf was quoted in the separate TMZ Article (linked to the Article) as saying that that L.H.'s "basis for filing a protection order is non-existent, fraudulent, and deliberately omits key facts, information, and

her own relevant communications[,]" which supposedly "make clear that Mr. Bauer did 'deny that he was responsible.'" *Id.* ¶ 51. But Mr. Fetterolf's statement does no such thing. Read in full, it simply asserts that L.H.'s *legal claim* for a protective order was insufficient because what happened between Plaintiff and L.H. was consensual. At the same time, it confirms that Plaintiff *was* responsible for her injuries – the exact thing that Plaintiff now claims is false. *See* TMZ Article (quoting Fetterolf's statement that "Mr. Bauer had a brief and wholly consensual sexual relationship initiated by [L.H.]," that L.H. "repeatedly ask[ed] for 'rough' sexual encounters involving requests to be 'choked out' and slapped in the face," and that during their encounters "she went on to dictate what she wanted from [Plaintiff] sexually and he did what was asked."). Further, the Article's description of Mr. Fetterolf's statement fully and fairly summarized his position, noting that he claimed the encounters were "consensual"; that L.H.'s declaration was "fraudulent" as it "omitted key details" and that L.H. had asked for "rough sex"; the full statement was also available through the direct hyperlink to the TMZ Article. Plaintiff has therefore failed to identify any way in which the Responsibility Statement is materially false, and it is thus non-actionable as defamation.

2.   The Skull Fracture and CT Scan Statements are Substantially True

Plaintiff also alleges that he has been defamed by the statement in the Article that L.H. "didn't consent to have her face beaten and her skull fractured" as a result of her encounters with Plaintiff, and that, in Plaintiff's defense, he claimed that "only the initial CT scan showed a fracture." Compl. ¶¶ 46-47, 91-92. Plaintiff asserts that these statements are false because there was only an initial diagnosis that L.H. exhibited "signs of a basilar skull fracture" and because there was not an "initial CT scan" that showed a fracture. *Id.* Plaintiff is wrong to suggest that these minor discrepancies can support a claim for defamation.

There is no difference in the "gist" or "sting" between being beaten badly enough to be diagnosed with "signs of a basilar skull fracture" – which is an accurate statement of L.H.'s injuries – and being beaten badly enough to suffer a skull fracture – which is allegedly false. In this regard, the "pleaded truth" – that L.H. had her "face beaten" so severely that her doctor's initial diagnosis was a skull fracture – would have no different effect on the average reader than would the statement as published.  Nor would there be any different effect had the Article said that the "initial diagnosis" indicated signs of a skull fracture (indisputably true) rather than the "initial CT scan" did (allegedly false).[12]  In either case, the reader is left with the same impression – that, according to the Article, L.H.'s injuries were severe enough that she could not have consented to suffer them.[13]  That core meaning would be the same regardless of the alleged inaccuracy in the statements. *See, e.g.*, *Tannerite Sports*, 864 F.3d at 249-50 (use of the term "bomb" substantially accurate to refer to products with explosive characteristics); *Cusimano v. United Health Servs. Hosps.*, 91 A.D.3d 1149, 1151-52 (3d Dep't 2012) (use of the word "narcotic" to refer to non-narcotic substantially accurate where "essence of the statement was that unsecured medications were found in plaintiff's office").  To hold otherwise, the Court would have to determine that changing these minor details regarding just one of the many injuries L.H. suffered would have left readers with an entirely different opinion of Plaintiff after

---

[12] Notably, the medical records also show that, in a follow up visit two weeks later, L.H.'s doctor ordered additional tests to rule out any "undetected fracture" that the prior tests might have missed.  L.H. Decl., Ex. 12 at 3. The Complaint's categorical allegation that "there was no skull fracture," Compl. ¶ 47, is therefore not supported by the record and need not be accepted, even on a motion to dismiss.  *Cf. Hicks v. City of N.Y.*, 232 F. Supp. 3d 480, 487 (S.D.N.Y. 2017) (Crotty, J.) ("[A] court need not accept as true an allegation that is contradicted by documents on which the complaint relies.").

[13] And, in any case, the Article noted that the subsequent CT scan did not show a fracture. *See* Article at 3.

reading the Article.  That conclusion is simply not plausible, and these statements are therefore

non-actionable.  *See, e.g.*, *Aboutaam v. Dow Jones & Co.*, No. 156399/2017, 2019 N.Y. Misc.

LEXIS 1287, at *14-16 (Sup. Ct. N.Y. Cnty. Mar. 22, 2019) (alleged misstatement about the

timing of an arrest was substantially true where pleaded truth "would not by itself change

whether the reader draws an evil opinion of Plaintiff after reading the article as a whole."), *aff'd*,

180 A.D.3d 573 (1st Dep't 2020).

### 3.  The Skull Fracture Statement Is Rhetorical Hyperbole and Therefore Non-Actionable

The Skull Fracture Statement is non-actionable for an additional, related reason – its

context clearly shows that it is opinionated rhetorical hyperbole.  As a matter of both New York

and First Amendment law, "evident 'rhetorical hyperbole' is simply not actionable" as

defamation.  *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 152 (1993).  "Context is key" in

evaluating whether a given statement qualifies as rhetorical hyperbole, and the court must

evaluate "'the circumstances surrounding [its] use, and the manner, tone and style with which [it

is] used.'"  *Finkel v. Dauber*, 29 Misc. 3d 325, 329 (Sup. Ct. Nassau Cnty. 2010) (quoting

*Steinhilber v. Alphonse*, 68 N.Y.2d 283, 291 (1986).

Here, the statement was made as part of an ongoing, passionate, nationwide public debate

regarding power, sex, consent, and justice.  "[R]hetorical hyperbole [is] normally associated

with" exactly this type of "emotional debate concerning emotionally-charged issues of

significant public concern[.]" *McDougal v. Fox News Network*, 489 F. Supp. 3d 174, 182

(S.D.N.Y. 2020).  Moreover, the Complaint itself recognizes that *Deadspin* is a publication

known for its irreverent style and use of hyperbolic language, Compl. ¶¶ 17-27; *see also* fn. 6,

supra, and courts in this Circuit have long accepted that the "general tenor" of a publication will

often "negate[] the impression that challenged statements imply defamatory facts about the

plaintiff." *Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 150 (2d Cir. 2000). Finally, the challenged statements appear in an editorial, not a news report, which "create[s] the common expectation" that it "represent[s] the viewpoint of [the] author and . . . contain[s] considerable hyperbole, speculation . . . and opinion." *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 507 (S.D.N.Y. 2012).[14] In short, the opinionated language of the Skull Fracture Statement, the nature of the publication, and the broader public debate surrounding the issues addressed in the Article all confirm that the statement is non-actionable rhetorical hyperbole.

### C. The Skull Fracture and CT Scan Statements Do Not Cause Any Appreciable Additional Harm to Plaintiff

The Skull Fracture and CT Scan Statements are also non-actionable under New York's "incremental harm" doctrine. That rule establishes that "when unchallenged or non-actionable parts of a publication are damaging, an additional statement, even if maliciously false, might be non-actionable because it causes no appreciable additional harm." *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 176 (2d Cir. 2001); *see also Herbert v. Lando*, 781 F.2d 298, 311 (2d Cir. 1986) (doctrine "measures the incremental harm inflicted by the challenged statements beyond the harm imposed by the rest of the publication. If that harm is determined to be nominal or nonexistent, the statements are dismissed as not actionable."). Here, Plaintiff challenges only minor alleged inaccuracies in the Article's description of prior reporting on the technical specifics of L.H.'s medical report. At the same time, the Complaint makes no allegation that

---

[14] "[T]he New York Constitution provides for absolute protection of opinions." *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 178 (2d Cir. 2000), and when "a statement of opinion . . . discloses the facts on which it is based . . . the opinion is not actionable." *Ganske v. Mensch*, 480 F. Supp. 3d 542, 554 (S.D.N.Y. 2020). Here, the Article links directly to the Athletic Article and TMZ Article on which the challenged Statements are based, providing the reader with exactly the "opportunity to assess the basis upon which the opinion was reached in order to draw the reader's own conclusions" that New York law requires. *Davis v. Boeheim*, 24 N.Y.3d 262, 269 (2014).

there was anything inaccurate or defamatory in the numerous other highly pejorative statements about Plaintiff in the Article.  The Complaint does not challenge statements in the Article that, among other things, L.H. had "her face beaten," that she was allegedly "sexually assaulted," and that she was "anally penetrated without consent."  *See generally* Article.  It defies common sense to conclude that the Skull Fracture and CT Scan Statements caused Plaintiff additional damage beyond the contents of the rest of the Article.[15]  Accordingly, the Complaint should be dismissed, as "the unchallenged parts of a publication cause the vast majority of reputational harm – such that the challenged statements harm to a non-actionable degree."  *Lindell*, 2021 U.S. Dist. LEXIS 237022, at *5 n.4.

### D.  The Allegedly Defamatory Statements Are Absolutely Privileged Under New York Law

Even if they were otherwise actionable (they are not), the allegedly defamatory statements are absolutely privileged under New York's statutory fair report privilege. That law provides that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding." N.Y. Civ. Rights Law § 74. It provides an absolute privilege against defamation claims for any publication that meets the relevant criteria.  Moreover, New York courts adopt a "liberal interpretation of the 'fair and true report' standard of . . . § 74 so as to provide broad protection to news accounts of judicial . . . proceedings." *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 93 (2d Cir. 2017).

The fair report privilege applies when "the ordinary viewer or reader can determine from the publication itself that the publication is reporting on [a judicial] proceeding." *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 179 (2d Cir. 2021).  Here, that standard is easily satisfied – the Article

---

[15] The Complaint implicitly acknowledges this, as it does not allege any special damages traceable to the challenged statements.  *See infra*, Section I.F.

is rife with references to the underlying court proceeding, including a quote from the Athletic Article regarding what was in L.H.'s "request to the Court," multiple references to a police "investigation," statements from Plaintiff's "lawyer," and an entire paragraph regarding the author's perception of how sexual assault cases are adjudicated in American courts.  Moreover, notwithstanding Plaintiff's attempt to evade the privilege by arguing that the source for the Article's details of the Petition was the Athletic Article and not the court papers themselves, Compl. ¶ 99, numerous cases confirm that the fair report privilege extends to reporting based on second-hand accounts of court proceedings.  *See, e.g.*, *Cholowsky v. Civiletti*, 69 A.D. 3d 110, 115 (2d Dep't 2009) ("the fact that [a defendant] derived information about the judicial proceedings from secondary sources d[oes] not mean that Civil Rights Law § 74 [i]s inapplicable"); *Test Masters Educ. Servs. v. NYP Holdings*, 603 F. Supp. 2d 584, 588 (S.D.N.Y. 2009) (applying privilege to reporting on press releases that contained summaries of official proceedings); *Adelson*, 876 F.3d at 415 (applying privilege based on hyperlinks to news articles describing court proceedings.).

Nor can Plaintiff argue that the Article's description of the underlying proceedings is not "substantially accurate."  Compl. ¶ 101.  Under New York law, "[a] statement is deemed a fair and true report if it is 'substantially accurate,' that is 'if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth.'" *Friedman*, 884 F.3d at 93.  Here, then, the Article qualifies for the fair report privilege for the same reasons that the allegedly defamatory statements are substantially true.  *See* Section I.B, above.  The challenged statements are absolutely privileged and non-actionable.

### E.  Plaintiff Has Failed to Adequately Allege Actual Malice

Because he is a public figure, in order to prevail in a defamation action, the First Amendment requires Plaintiff to plead, and ultimately prove, "actual malice" by clear and convincing evidence. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).  Moreover, regardless of Plaintiff's status as a public figure, New York's recently amended "Anti-SLAPP" law requires him to make the same showing.  *See* N.Y. Civ. Rights Law § 76-a (requiring that a plaintiff must prove actual malice in any action involving "any communication in a place open to the public or a public forum in connection with an issue of public interest.").[16]  Actual malice is a term of art that "does not mean maliciousness or ill will; it simply means the statement was 'made with knowledge that it was false or with reckless disregard of whether it was false or not.'"  *Palin v. N.Y. Times Co.*, 940 F.3d 804, 816 (2d Cir. 2019).  The standard is not objective: the beliefs or actions of a hypothetical reasonable person are irrelevant. Rather, the standard asks "whether there is sufficient evidence 'to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication[.]'"  *Behar*, 238 F.3d at 174 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

Plaintiff's primary theory of actual malice is that Defendants knew the Skull Fracture Statement and the CT Scan Statement were false because Defendants relied on the Athletic Article as the source for those statements, and the Athletic Article (as corrected) stated that "Trevor Bauer's representatives emphasized that medical records showed that while the woman was initially diagnosed with signs of a basilar skull fracture, a subsequent CT scan found no acute fracture."  Compl. ¶¶ 53-55.

---

[16] As a "substantive" standard, Section 76-a's actual malice requirement applies in diversity cases in federal court.  *See, e.g.*, *Coleman v. Grand*, 523 F. Supp. 3d 244, 258 (E.D.N.Y. 2021).

This theory is fundamentally flawed for multiple reasons.  Most obviously, the Article

itself *contained a link* to the underlying, corrected Athletic Article.  Article at 2.  It is simply not

plausible for Plaintiff to suggest that Defendants were subjectively aware that they were

publishing a deliberate falsehood, and at the same time provided a link to the very source that –

according to the Complaint – demonstrates their knowledge of falsity.  Indeed, "[a]s the courts

have frequently noted, inaccurate or imprecise language, even if critical of the plaintiff, does not

suffice to demonstrate [actual] malice where the underlying facts have been disclosed." *Konikoff*

*v. Prudential Ins. Co. of Am.*, No. 94 Civ. 6863 (MBM) (MHD), 1999 U.S. Dist. LEXIS 13501,

at \*88-89 (S.D.N.Y. Aug. 31, 1999) (collecting cases), *aff'd*, 234 F.3d 92 (2d Cir. 2000). That is

exactly the situation here – as the Complaint itself alleges, the Article provided a hyperlink to the

Athletic Article, and therefore disclosed the facts underlying the challenged statements.

Defendants' inclusion of that link thus completely undermines Plaintiff's theory of actual

malice.[17]  *Cf. Adelson*, 973 F. Supp. 2d at 484 (noting that "the hyperlink is the twenty-first

century equivalent of the footnote for purposes of attribution in defamation law[.]").

At most, Plaintiff's allegations, even if taken as true, establish only that Defendants

misinterpreted the phrase "subsequent CT scan" as used in the Athletic Article to imply that

L.H.'s "initial diagnosis" of a skull fracture was the product of a *previous* CT scan.  Indeed, the

Complaint itself acknowledges that this is exactly what happened.  Compl. ¶ 61 (noting that in-

house counsel for Defendants explained that "[t]he reference to 'subsequent CT scan' suggested

that the evidence of a fracture was based on a prior scan.").  But, as a matter of both New York

---

[17] For the same reason, Plaintiff's claim that the Responsibility Statement was made with actual malice because the "TMZ article linked in the Article included a statement from Mr. Bauer's counsel denying responsibility" fails as a matter of law.  Compl. ¶ 56.  Moreover, as explained in Section I.B.1, *supra*, it is simply not true that Plaintiff's counsel's statement denied that Plaintiff was responsible for L.H.'s injuries.

and First Amendment law, such good-faith misinterpretation of ambiguous source material is insufficient to establish actual malice.  *See, e.g.*, *Suozzi v. Parente*, 202 A.D.2d 94, 102 (1st Dep't 1994) (actual malice cannot be "founded on the misinterpretation of a source or the resolution of an ambiguity adversely to the plaintiff[.]"); *Time, Inc. v. Pape*, 401 U.S. 279, 291 (1971)) (misinterpretation of an "ambiguous" and "lengthy government document" insufficient to demonstrate actual malice); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 594 (D.C. Cir. 2016) ("An honest misinterpretation does not amount to actual malice even if the publisher was negligent in failing to read the document carefully.").

The Complaint also advances two additional theories of actual malice.  First, it claims that Defendants' "actions following the publication of the article confirm[] they acted with actual malice," referring to supposedly inadequate attention given to Plaintiff's post-publication requests for modifications of the Article.  Compl. ¶¶ 57-65.  But these allegations are categorically irrelevant to the determination of actual malice, which must be evaluated at the time of publication, not afterwards.  *See, e.g.*, *Celle*, 209 F.3d at 182 ("[A] public figure cannot recover damages for defamatory falsehoods unless he or she proves that the statement was made with actual malice *at the time of publication*."; *Kipper v. NYP Holdings*, 12 N.Y.3d 348, 354-55 (2009) (the actual malice "inquiry is thus a subjective one, focusing upon the state of mind of the publisher of the allegedly libelous statements *at the time of publication*.") (emphases added).

Second, Plaintiff claims that Defendants' actual malice can be demonstrated by their "complete disregard for G/O Media's own 'Editorial Policy'," in particular that Defendants "[failed to] verify" the allegedly defamatory statements by reviewing L.H.'s medical records. Compl. ¶¶ 66-69.  But, the law is abundantly clear that such a "failure to verify" or "failure to investigate" does not constitute actual malice.  *See, e.g.*, *Gertz v. Robert Welch*, 418 U.S. 323,

332 (1974) ("[M]ere proof of failure to investigate, without more, cannot establish reckless disregard for the truth."); *Boyd v. Nationwide Mut. Ins.*, 208 F.3d 406, 408 (2d Cir. 2000) ("It is well settled that a defendant's failure to investigate before making defamatory statements does not support a finding of actual malice.").

### F.  Plaintiff Has Failed to Adequately Allege Damages

Plaintiff's defamation claim also fails for a separate, independent reason: none of the allegedly defamatory statements are defamatory *per se*, and Plaintiff has failed to allege special damages.[18] Under New York law, to plead a cause of action for defamation, the statement at issue "must either cause special harm or constitute defamation per se." *Dillon v. City of N.Y.*, 261 A.D.2d 34, 38 (1st Dep't 1999) (dismissing libel claim). "The issue of whether a statement is actionable per se is for the court." *Albert v. Loksen*, 239 F.3d 256, 271 (2d Cir. 2001).[19]

Plaintiff merely states conclusorily that the challenged statements "charged [Plaintiff] with a serious crime and maligned him in his profession."  Compl. ¶ 109.  This is insufficient and incorrect.  For a statement to constitute defamation *per se* by "injuring another in his or her profession," it must directly implicate Plaintiff's ability to "perform" his "cognizable trade." *Oakley*, 833 F. App'x at 900. Statements that merely impugn a person's "character or qualities" do not meet this strict standard. *See, e.g.*, *Liberman*, 80 N.Y.2d at 436 (statements must be

---

[18] "Special damages are specific and measurable losses which must be alleged with sufficient particularity to identify actual losses and be related causally to the alleged tortious acts." *Oakley v. Dolan*, No. 17-cv-6903 (RN), 2020 U.S. Dist. LEXIS 28267, at *26 (S.D.N.Y. Feb. 19, 2020), *aff'd*, 883 F. App'x 896 (2d Cir. 2020).

[19] At common law, courts in New York recognized four categories of statements as defamatory *per se*: "(1) those that accuse the plaintiff of a serious crime; (2) those that tend to injure another in his or her trade, business or profession; (3) those that accuse the plaintiff of having a loathsome disease; or (4) and those that impute unchastity to a woman." *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992)).

"incompatible with the proper conduct of the business, trade, profession or office itself," and "must be made with reference to a matter of significance and importance for that purpose"); *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 487 (S.D.N.Y. 2013) (statement must reference "a matter of significance and importance for [the operation of the business], rather than a more general reflection upon the plaintiff's character or qualities."). Here, none of the allegedly defamatory statements have anything to do with Plaintiff's abilities as a baseball player, and therefore cannot reasonably be read to "injure him in his profession."

Nor can the allegedly defamatory statements reasonably be read to falsely "accuse Plaintiff of a serious crime." To be sure, the Article reports on allegations of sexual assault levied against Plaintiff. But it was L.H., not Defendants, who accused Plaintiff of committing that offense, and Defendants are of course entitled to report on those allegations. *See* Section I.D, *supra*. None of the three allegedly defamatory statements in the Article accuses Plaintiff of any additional or different serious crime. *See, e.g.*, Compl. ¶¶ 91-93 (specifying allegedly defamatory statements). Therefore, as the statements are not defamatory *per se* and as Plaintiff has failed to allege any special damages, the defamation claim must be dismissed.

## CONCLUSION

For all of the foregoing reasons, Defendants the Court should dismiss Plaintiff's Complaint, with prejudice, and grant such other relief as the Court finds just and reasonable.

Dated: June 10, 2022          By:  /s/ Lynn B. Oberlander
New York, New York                Lynn B. Oberlander
                                  Joseph Slaughter
                                  BALLARD SPAHR LLP
                                  1675 Broadway, 19th Floor
                                  New York, New York 10019-5820
                                  Phone:  (212) 223-0200
                                  Fax:  (212) 223-1942
                                  oberlanderl@ballardspahr.com
                                  slaughterj@ballardspahr.com
                                  *Counsel for Defendants*

25